Good morning ladies and gentlemen. I'm happy to be in San Francisco on this beautiful day and we understand that counsel are present. Judge Fletcher had an unplanned absence from the city and so he is with us by telephone. Are you hooked up, Judge Fletcher? I am here and listening. Good. Judge William Fletcher. And so we understand counsel are here and may proceed with their argument in the case of Parents Involved in Community Schools v. Seattle Schools. Thank you, Your Honor. My name is Harry Correll and I represent Parents Involved in Community Schools. With me today are two of the parents, Board Member Jill Kerr-First and the Board President Kathleen Brose. I'd like to reserve about ten minutes for rebuttal if I might. In a city as diverse as Seattle, with a high school system as naturally integrated as ours, there is simply no justification for government to tell children they cannot attend the schools of their choosing solely because of the color of their skin. But that is exactly what happens in Seattle. In 2000 and 2001, the school district told over 300 students that they could not attend their preferred schools solely because they were of the wrong race. And the only thing accomplished by this discrimination is a trivial adjustment in the white-nonwhite mix in a handful of schools that are already diverse and integrated. Whatever the constitutional merits or demerits of racial diversity in the abstract, the record here shows two things. First, that the use of race is simply not necessary. Seattle schools are diverse without it. And second, the plan fails nearly all of the other narrow tailoring tests set out by the Supreme Court and this Court as well. Are we in the strict scrutiny category at all? Without question, Your Honor, we are. Well, let's question it just for the sake of completeness. This is not a stacking plan. It's a shuffling plan, if I understand the nomenclature correctly, right?  Okay, let's talk about that. Just to make sure it's the same language, a stacking plan is a plan that gives one race a preference over another. So if you are, you know, whatever, nonwhite, you get 10 extra points on an admission test or something. That's a stacking plan. A shuffling plan is a plan that sort of tries to make sure that the races mix, but you don't know in any one instance whether the denial will be for a white student or a black student or an Asian student or whoever. It's simply a mixing of the races. And your contention is this is a stacking plan in that it favors one race over another. That's correct. Okay. I didn't get that from the record. I thought this was a shuffling plan. But I'm willing to be persuaded. Your Honor, it's a stacking plan because there is a limited benefit available, which is attendance at these popular, oversubscribed, objectively better schools. That's a limited benefit the government can make available. And decisions about who gets that benefit are made solely on the basis of race. Well, that would be true whether it's a stacking plan or a shuffling plan. Because we don't know what the baseline for those schools are. We don't know whether it's blacks or whites or nonwhites who get preference. That's different from the Michigan plans where if you were a certain race, you got 10 extra points in the undergraduate school. I'm talking about the undergraduate plan. Well, it's clear there was never a situation where somebody white would get a preference. It would always be somebody who is of a different race. Here we don't know. It might be that some of the kids turned away are white. Here we just have white and nonwhite, so it could be one or it could be the other. We don't know what it is. But this Court's jurisprudence and the Supreme Court's jurisprudence has made clear, in our view, that the right to equal protection is a personal right. It's an individual right. That's in Croson. It's in Adirondack. I understand. I understand. But you said this is a stacking plan. And I'm trying to pursue that question. Well, it's a stacking plan. That it systematically favors one race over another? It does not do that, Your Honor. Okay. So given that it does not systematically favor one race over another, why isn't this simply a rational basis review? It is not a plan where they give one race a preference. Why is this? Well, what case says that in this case, what Supreme Court case, or one of our cases, say that in a plan where your race is used as a factor but is not used as a preference for a race over another, that we use strict scrutiny? Croson, Adirondack, Monterey Mechanical, Smith. All stacking plans. Would you explain your position a little? Your Honor, understand. This the judge's question, I think, assumes that because there's discrimination against one group sometimes and against another group some other times, that is, therefore, not discriminatory but something else, reshuffling, perhaps. In our view, and I believe in this Court's jurisprudence and the Supreme Court's jurisprudence, the right to equal protection is an individual right. And when an individual is denied the right to equal protection, denied admission to a school, for example, solely because of his or her race, that implicates that requires strict scrutiny. Could you explain to me who your clients are? Our clients, the parents involved in community schools. And it's an association of parents of children who have been or who may be affected by the school district's assignment plan, including parents whose children were denied admission to schools because of their race. Of either race? Yes. There are parents of many races in the parent association. Could you explain what you mean when you say Seattle Public Schools are sufficiently integrated? How do you know that? Your Honor, if you may. How do you define sufficiently integrated? Well, there are a couple of benchmarks that I think the Court can use. One is you can look at the definition of segregation used by the Supreme Court. We've cited the Keyes decision. We've cited other decisions that explain that a school system is segregated when there's a dual system. Well, that goes back to the old de jure segregation. But how are you defining it for purposes of telling us today that there are a sufficient number of minority students in one school or another? Your Honor, we rely on the data that we submitted at page 20 of our briefs. And what that data shows is that even at the whitest school in the district, Ballard High School, without any use of race, it would be in excess of 37 percent minority. So how do you know that's sufficient? What's your measurement? Well, we can look to the definitions of segregation, which I mentioned. We can also look to the testimony of the school district's own expert, who testified that in his view the point at which schools get the benefit of diversity is at about 20 percent minority in a predominantly white school. These schools, the three predominantly white schools that are oversubscribed, have minority populations ranging between 37 and 45 percent. And it seems to strain credulity to us to suggest that those schools are insufficiently integrated to require use of a most pernicious classification, a racial classification, to decide who can get that limited benefit. I'd like to go back to Judge Kaczynski's question. Can you cite to this Court a single case involving shuffling that applied anything other than a rational basis standard? Why don't you start with a yes or a no? I don't think I can, Your Honor. Well, the answer is no. I think that's right. The shuffling cases. So if the import of his question is correct and you're wrong that this is shuffling, not stacking, then it's rational basis. I think that's right, Your Honor, if I understand the question. But to suggest that a plan that denies a limited benefit to a student because of race is subject to anything other than strict scrutiny is contrary to many years of decisions from the U.S. Supreme Court. Can any plan be used to either stacking or shuffling to achieve racial balance in a school district ever? On this record, Your Honor, our position is there is no basis for using a race-based plan. It's simply not necessary in Seattle, and if it's not necessary, it can't be done. But who makes the decision? It's not a race-based plan. This has the four different factors are used. It's one of four factors, isn't it? When race applies, it is controlling, absolutely controlling. That is. That's because the factors are used in order. It's not that the four are considered. You use first siblings and then race. That's correct. And any one of the preferred race gets in ahead of any one of the non-preferred race? That's correct, Your Honor. It's not like the Michigan case where you have a number of factors that get evaluated and a decision is ultimately made. Is there any individualized consideration like the Michigan law school case, or is it purely numerical like the Michigan undergraduate case? It is automatic and numerical. It is controlled by a computer algorithm. There's no individual consideration. How would the allocation go if they went instead on distance set? I'm sorry? Would you concede that in the Seattle school district that there could be a need for racial integration at some level, some level of percentage? You're satisfied with the percentage distribution now, but in a public school system where there is an imbalance, would you concede, as the majority found in the panel opinion, that there is a compelling interest for racial integration in public education? Parents agree that integration is important. And if our children agree that it can be a compelling interest. Yes, if the alternative is segregation. The issue is really it's a definitional one. So let's suppose that the plan goes with distance being the second factor and then the school is oversubscribed. How would you go about achieving racial balance or racial integration in an oversubscribed school where if you went strictly on distance as the second factor after sibling, how would you go about achieving racial balance? To – I would do nothing. I would allow – I would allow distance. You would let the neighborhood factor make the determination on the open choice such that a school could be, say, 90% white under that scenario and the school couldn't do anything about it? Except that's not what happened. No, I'm not saying what happened. I'm asking you – Judge Kleinfeld asked about the sequencing. So I'm changing the sequencing so that neighborhood proximity dictates the involvement in the school. And that factor then produces, by most people's definition, let's say it's 95% white. Okay? Now, would you say that you could apply a racial factor to achieve some kind of racial balance? No, for two reasons. First, if those are – if that's driven by private choice, our reading of the constitution of the cases, including Monterey Mechanical, Ho, and Smith, is that because that's driven by private choices, not by past segregation, the government is powerless. But I do want to address one – just one quick point on this, Your Honor. We don't have to guess what would happen here. The data that we've provided, the school district provided at page 20 of our brief shows what would happen in these oversubscribed schools if we used distance alone. That's what gets us 37, 45 percent. Let's pass this business of private choice. I mean, there are two choices involved in whether something is a neighborhood school. One is whether people live there, and the second one is whether the school district chooses to put a school there, and what resources are devoted to a particular school. So it's not private choice entirely. If they decide to put the school in a white neighborhood and give it lots of resources and give it extra science courses and all of those things, that is a public choice, not a private choice. And then you say, well, now we're using a neutral factor. We're just going to measure distance from the schoolhouse door. We've placed the school in this white neighborhood, and, you know, too bad. That doesn't strike me as being a totally private choice situation. I understand Your Honor's point, but that's not what happened here. I mean, there's no evidence in this case that the Seattle School District has done anything other than its best efforts to make sure that all schools are of good quality and that it has tried where it can. Then why are the schools in the white neighborhoods better than the schools in the minority neighborhoods? I don't know, Your Honor. But that's the fact. That's the fact. Why shouldn't those kids there in the minority neighborhoods have the benefit of going to schools where there are better classes, apparently better teachers, and all the rest of it? We agree that that opportunity should be made available. We simply disagree that it is permissible to use race as the deciding factor. Race decisions like this are unconstitutional. Can I ask you a question about we're kind of using interchangeably like racial diversity and racial balance. How do you see those two playing out here? Your Honor, the school district in its briefs has used the terms interchangeably. It has used racial diversity to mean the same thing as the absence of racial imbalance or the presence of racial balance, and equate that with the absence of segregation or the absence of racial isolation. In our view, the term segregation is a legal term, and it has been defined by the Supreme Court. And you can't conflate those terms without, in essence, making the result automatic. This is Judge Fletcher speaking. Sorry for interrupting. The term as it's used by the United States Supreme Court in segregation was used at the beginning to serve as the justification for court-mandated desegregation plans. That, of course, is not what's going on here. This is a plan voluntarily undertaken by the school board. And in that circumstance, where do we get the authority to tell the school board that it has made the wrong judgment as to what constitutes sufficient racial diversity in a particular school? From the Constitution. The Constitution simply says that you can't use race, as interpreted by the Supreme Court cases. But, of course, we know that you can use race, and even you can see that. You're only saying that, well, you can't use it here because the racial imbalance isn't enough. So I'm asking the question, well, how do we get the authority to second-guess the school board when it's making a voluntary plan, not a court-ordered plan, to remedy what it views as educationally detrimental because of the degree of racial imbalance? Your Honor's question suggests that this Court should defer to the judgment of school boards on when its actions are constitutional and when they are not. And we simply disagree. The Court is certainly free and is obligated to impose constitutional ‑‑ impose the constitutional requirements when the school board tries to do something. I'll step back and try that again. If a school board had used its discretion here and decided that it would be better to have kids of different races educated in different schools, we certainly wouldn't defer to that judgment. The Constitution imposes on this Court the obligation to ensure that the judgments are constitutional. And in this case, our position is that it is permissible to use race to remedy de jure segregation. But if the segregation that allegedly results, and we argue on the record it simply does not result here, but if it did result, the school district would not be allowed to use racial measures, race-specific measures, race-discriminatory measures, to attempt to address that. Even though the Supreme Court in Grutter said that you could. The Supreme Court in Grutter said that it was ‑‑ what was permissible was pursuing ‑‑ using race as one factor among many to accomplish ‑‑ You could use race. That's right. You could use race. That's right. It is not an absolute ban on using race. But you cannot use it in K-12, apparently, under your view, because they don't do a holistic individualized analysis of each student. Is that it? Our view, Your Honor, is that the Grutter and Gratz decisions are limited, as expressly set out in those opinions, to the context of higher education, where those universities ‑‑ The concept of teaching children or students about citizenship and being able to make a contribution to society and participate in a multiracial society is limited to college students and professional graduate school students. Not at all. Our view is that that makes the college community better without using race discrimination and the ‑‑ Even if the school is 99 percent black and a predominantly white school district, that would still make this a permissible to reassign black students into some of the white schools to see some kind of racial integration in the district. Your Honor, it would depend on the reasons that the schools are divided the way they are. It might be. But you said you can't use race. So it's your position that in a completely segregated ‑‑ the Washington, D.C., public school system in the 1960s had a one white high school and all the rest were black, but there were whites in the school district. There was no doubt that the schools were segregated by race. Are you saying that in that circumstance, the D.C. public schools, high schools had to remain segregated because you couldn't use race as a factor? Our reading, Your Honor, of the Supreme Court cases and of this Court's decisions, including the Ho case, is that if that ‑‑ if that result did not obtain because of de jure segregation, then it is impermissible to use race. Counsel, do you need this argument? I'm thinking, number one, in D.C. it did result from de jure segregation. And number two, as I remember grutter and grass, the Supreme Court held that the de jure was unconstitutional because it violated the Equal Protection Clause. But in the law school, it was constitutionally permissible and did not violate the Equal Protection Clause. And the difference was the individualized consideration as opposed to the mechanical consideration. Is my recollection correct on that? Your recollection is correct, Your Honor. And we simply don't need the argument. And this Court does not need to reach the, obviously, divisive issue of whether or not race is ever permissible by ‑‑ use of race is ever permissible by high schools, because in this case, on this record, it's simply not narrowly tailored. The use of race is not necessary. The way the district uses race here is a straight court. I mean, you keep saying it's not necessary, but I don't get it. I mean, you don't think it's necessary, but who are you? Who are we? The school board, as elected by the people of Seattle, I assume normal elections, right? And they made a decision that they want a mix of students that is more reflective of the community at large, that the various schools have more or less within a 15, within a 30% band, actually, which is a fairly broad band, they want the high schools to reflect the community. You know, I don't ‑‑ what position are we in to say, no, that's too much, you know, what they've got there is good enough? I'm not an educator. I don't have ‑‑ you know, you've got an expert who says that, but why do I believe you're an expert? He wasn't elected by anybody. You can believe the district's expert, who also says that it's enough. But that aside, this Court has not ‑‑ All the experts say it's enough, and elected officials, people who are elected by, stand for election, who are elected from the community say, no, we don't think it's enough. We think that a better education, a better experience will be enjoyed by our students if we have a better mix, a mix that more closely reflects the community at large. Why is that not a perfectly rational, perfectly sound judgment that we can't really second guess? Your Honor, it may be rational. It simply doesn't satisfy strict scrutiny. Maybe it would be easier if you told me what type of things would the district be entitled to deference on? Things that don't involve using race classifications, Your Honor. Decisions to use distance, to use a lottery, for example, to use socioeconomic status as a tiebreaker, to look at some of the other notions that the Supreme Court endorsed in the ‑‑ in the recent Michigan decisions regarding a more genuine diversity, family background, income, English as a second language, a number of considerations the school district could consider, but using race is different. The Croson case has a cautionary language, and I was trying to find it here in my notes and can't, about deference to government, and deference to government is not due when it is using race, the most suspected classification. That's another preference case. Croson, I'm very familiar with Croson. I'm familiar with associated general contractors, which was our case, which proceeded Croson. All those were cases where minority businesses were given preferences in contracting. They were given extra points or a tiebreaker. I mean, also, you know, if you were a minority, you got benefit. There's never a situation in which a nonminority firm got a benefit, got anything but a detriment. And I'm still back to my original question. I don't see why we judge a process that is outcome neutral as far as race is concerned. I mean, not in any one individual case, but in the aggregate, the process is race neutral, but the same standard as we judge a process that consistently favors one race over another. And our answer, Your Honor, is the same, which is that equal protection rights are individual rights, not group rights. No, I know you've said that, but it's not a satisfying answer. Why don't you give me a good answer? Why don't you give me something that — why does it make sense? I mean, in my gut, I feel, yes, a system that favors one race over another, I mean, that's not the way government ought to be run. I can really understand why that is the case. But one that says, look, we're going to have a system where everybody's going to mix together. We're going to make sure they're mixed together. And sometimes blacks get favored, and sometimes whites get favored, and sometimes Asians get favored. And that's just the way it is. Society, you take your lumps along with everybody else. Why is that? It just doesn't strike me as being the same kind of objectionable as a system that says if you are a particular race, you get the next advantage. And if you're a different race, you get to run the race with a shackle on your foot. And, Your Honor, as I've said before, equal protection rights are not group rights. They're individual rights. Yeah. And the Supreme Court has said that. I guess I understand your answer. But I don't quite understand how you explain it in light of at least a hypothetical history here of a school district making decisions to build better schools and nicer schools and pay higher salaries and do all sorts of things in white, predominantly white neighborhoods. Can't they compensate for that? Yes, they can compensate for that. That is de jure segregation. No. No. It's not de jure. I'm sorry. Nobody is saying that all the blacks have to go to a or the minorities have to go to a school. It's just that they put more money into the schools in the north than the south. I think, Your Honor, that the Supreme Court cases, I think Keyes addresses this to some degree, indicate that if that's what has happened, then what you have is a segregated system. And it is permissible to use race to remedy that. Do they put more money into the schools in the north than the south? They don't, Your Honor. My understanding of the way the weighted student formula, the way the funding plan works in Seattle is actually more money is funded into the schools with more students with more special needs. Is that local money or federal money? I don't know the answer to that, Your Honor. What percentage of the minority students are really benefited by, you know, this formula that you go through, these different steps? I'm not sure I understand the question. Which formula is that, Your Honor? Well, you go through different steps, right? You've got if you've got one sibling in a school, the other sibling gets to go, right? That's right. All right. Now, when it comes down to where, say, minority status is a factor, what percentage of minority students who end up in the better schools are affected by that? Is it 1 percent, 2 percent, 3 percent? I don't. I'd have to do the math, Your Honor. I believe that in the year for which we have the data, 200 minority students received assignments to schools that would have gone to white students, and 100 roughly white students received assignments that would have gone to minority students had it not been for the race tiebreaker. I've only got about three and a half minutes left, as I need to take a little bit of time for rebuttal, but I do encourage this Court to do as the panel did, reverse the district with instructions to enjoin the use of both the original and the replacement plan. Thank you. May it please the Court, my name is Michael Madden. I represent the Seattle School District, its board of directors and superintendent. The district petitioned for rehearing en banc here, principally because the panel majority treated the integration tiebreaker as if the district were operating a merit-based selection process for an elite university. In so doing, the panel doomed any conceivable race-conscious K-12 general assignment plan because, by their very nature, such plans do not involve any plan. As I remember, the Urban League, with the NAACP participating, came up with another plan and the school district said, well, it's not our plan, so we didn't pay any attention to it. I don't think that's a fair rating of the record, Your Honor, certainly not on summary judgment. The record reflects that the Urban League proposed a regional plan where schools would be, assignments would be decided within regions that were drawn out on a map. Those regions, in some cases, passed cross-racial boundaries. In others, they didn't. Within those regions. Basically, it's kind of redraw the lines so that you get a diverse school. That was not the conclusion of the school board. The conclusion of the school board was, to quote the board member with whom the panel majority had so much fun quoting his tongue-in-cheek comments, that it was controlled choice all over again. I understand what that means. I need to go there. What we think is the most important issue for this Court is to come up with a contextually appropriate analysis of the plan. Let me back you up for a moment to what you said at the beginning about how, about other plans. There was some discussion in the Michigan case by a justice of a lottery to admit students to the school. Michigan did not want to do that because it was a highly selective school, and it would eliminate the selectivity that made it a superior school. The public schools in Seattle are not selective. Everybody is entitled to go to public school. You don't get selected out because you had a C average. So one of the other plans that was suggested as a means of achieving diversity was lottery. And I really don't understand why that was rejected. It seems to me that what you've got is, instead of a lottery, you've got a plan that burdens some children with four hours on municipal buses every day. And the way a particular child draws that misfortune is because the skin is the wrong color. Some black children have to bus all the way to white schools way across town. Some white children have to bus all the way to black schools way across town. Asian children. And the reason they're on the bus is they're on the wrong color. They can't get into their neighborhood school. I don't believe with all respect, Your Honor, that that's accurate. It's certainly not accurate. Okay. Explain what I'm missing. Well, let me go back to the question that you started with, the lottery. Okay. As the record discusses in considerable detail, Seattle has been through many years of race-conscious methods or attempts to integrate its schools. The current plan is neither the beginning nor necessarily the end. I have always been amazed at the race-consciousness of educators. So what Seattle found out along the way... I'm not amazed at this. I think it's a good idea. What Seattle found out along the way is that families value a number of things, and this is documented in the record. They value choice. They want to be able to pick the school that they think is best for their child. So if they like the school across town better than the neighborhood school, then they want to be able to go across town. They also like neighborhood schools because they're convenient. They build a sense of community. They also like diversity. And so when it forms... It seems to me you've left out an important factor there about neighborhood, and that's travel time. If you go to algebra class in 11th grade, the teacher shows you how to work the problem on the board. You don't learn algebra until you work a lot of problems at home doing your homework. But if you're on the bus for four hours a day, you don't do any homework. You can't. You don't have time. So all you get is an imitation of education. Let me clarify the record on that. Principally, and I think this is the most significant feature to this contextually appropriate analysis that I'm talking about, in Seattle, on this record, a student could choose one of those popular high schools and be admitted to one of them at least, regardless of their race. The record about this four-hour bus ride pertains to one of the parents' families. It involves a student who was assigned to one of those popular high schools, Franklin, in the predominantly minority Rainier Valley. But because, as I recall the record, she played in orchestra, not the jazz band, she chose Ingram High School in the north end, which was one of the undersubscribed high schools. And at the time she chose it or was assigned to it, there wasn't bus transportation. Now, later, bus transportation was arranged. So there never was any four-hour bus ride. There's no evidence what the four-hour bus ride was offered was to explain why this parent chose to put this student in private school. At the same time, the same parents in the Magnolia area of Seattle were complaining that they couldn't get into Nathan Hale High School, which is even further away. So I think one of the very troubling aspects of the panel decision is this was a summary judgment record. And the panel went through the board's decision making and said, well, you could have used a lottery. Well, lottery doesn't allow the board to accommodate competing values. And as has been discussed amply here, this is not a court-ordered plan. This is a matter of educational policy. And so the board, we think, was entitled to balance these matters. Kennedy, where does the board come up with the justification for the percentage that it adopts as the trigger point for taking race into account? In the Michigan case, Justice O'Connor talked about critical mass and was willing to give some the court was willing to give some deference to the concept of critical mass, but what is the justification for picking the number that has been picked? And in answering that, could you please address counsel for the plaintiff's argument that Seattle is already racially balanced? So why do you need to do this at all? We call the range the band. And if you'll bear with me, I'm going to use that term. And it's been at various times over the life of Seattle's various plans, including its mandatory plan, anywhere between 10 and 20 percent. That number as a historical figure comes from the desegregation cases, and it's a range that's commonly used and it's picked up in the regulations under the Magnet School Act, I believe, to define racial imbalance as a plus or minus, and it can be 10, it can be 20. One of the issues that parents raise is the idea that, well, at one year, the superintendent proposed going to 20 percent, and the board rejected it, and that's proof of failure of narrow tailoring. And what we point out is whatever the superintendent was thinking, that would have left only one high school, Ballard High School, to bear all the burden of movement from the south end. And so the 15 percent was adopted to try to ameliorate some of the perceived negatives of having 10 percent, but not go so far as to make the plan nonfunctional. Now, with respect to why is that not racial balancing, which Justice O'Connor said in Grutter  is unconstitutional? Racial balancing without a permissible purpose, without a compelling interest behind it, is unconstitutional. But I think, as Judge Graver went through in considerable detail in her dissent, where you have, as you might have, to remedy de jure segregation, you pursue racial balance. If the goal that you are trying to achieve, and this is the goal that's different than Grutter, that we're trying to achieve here, is racial diversity, because it improves educational and social outcomes, and integration, which is the flip side of it, to get around Seattle's housing patterns, then why condemn a plan that has a racial purpose because it uses race? Well, isn't that what the narrowly tailored analysis is all about? Isn't the question then that we have to decide whether the means chosen, picking a number and balancing schools based on that number, solely on account of race as the determinative factor, is the most narrowly tailored means the school board could choose to address the problem? Judge Talman, I don't think that the plan can be fairly said to pick a number or impose a quota. All that it does is, with respect to these most popular schools, to try to see to it that the choice patterns that we experience in Seattle don't drive that school too far away from the environment of the community, because we're trying to train and educate students to function in that community. And the effect of the plan is, of course, as I said, to allow students to choose amongst those popular schools, regardless of race, you can get into at least one of them. If you had simply picked by neighborhood, if you just picked by neighborhood, I said everybody goes to the neighborhood schools, as far as the record reflects, would that make all of the better high schools, the desirable high schools, practically all white? I don't know anything about Seattle neighborhoods. As far as the record is concerned, is it that the better high schools are in the white neighborhoods? What we see is that no, let me answer your questions in kind of reverse order. Franklin High School at the time, and this question of better high schools is one of perception, and it changes based on whether someone has a new building or a new principal or a new program, but on this record, Franklin High School, which is a predominantly minority high school, very popular, highly regarded in the south end of Seattle, was oversubscribed and it was available to white students from west Seattle, which is south of downtown but west on the water, and to north end students, any of them who wanted to come to that school, and that accounted for about a third, maybe, of the movement. The other two-thirds, predominantly students were not. I'm not at all sure what that means. All right. Let me try again. Students moving to the, white students moving to the predominantly minority high school. Why don't we start with my question, which is, let's say we did it by neighborhood entirely. What would it look like? You would see the three popular north end schools that were subject to the tiebreaker, Ballard, Nathan Hale and Roosevelt, move towards the 65, 70% white students. That's about the flip of the district's overall demographic. And that reflects the demographics of north Seattle? If you change nothing, correct. Okay. And Franklin is the one school in the south? Franklin moves from perhaps 60, 65% minority, and I'm sure Mr. Correll is going to pull these numbers up, because I don't have them right in front of me, more towards 70, 75. And in the 70, 75 what? Minority. Percent minorities. As opposed to 60. 60. 60, which is what? What you see is in the entering classes, particularly What I'm getting at is, I'm wondering, you know, I was asking Mr. Correll about whether this is a stacking plan or a shuffling plan, and on its face it looks like a shuffling plan, because it's sort of race neutral, but I'm wondering whether in practice this really is a stacking plan. What it's really doing is moving, that all of the race decisions are really one-way decisions. That there is always a white student being denied access to school, or either a black student being denied access to school, or non-whites, you know. As I understand what is meant by a shuffling plan, this is a shuffling plan. Associated general contractors cited But we had 300 or so denials under the plan, or Mr. Correll tells us. Yes. Or based on race. Correct. Do we know what the racial composition of those 300 is? Yes. Approximately, the plan operated in favor of children of color on approximately 200 of those occasions, in favor of white children on approximately 100. So it's two-thirds, one-third approximately. Counsel? I'm sorry. When you say in favor of, these were denials, in what sense do you mean in favor of? Well, if you So if you're looking at denials, so if you stacked up the people who were denied, they would be what, 200 whites, 100 non-whites, or 100 That's right. 200, so it would be two to one Correct. Counsel, if we defer to the district's race-conscious preferences, choices of how to assign schools, and we defer to their choice among various plans, we don't require them to adhere to a particular plan, why couldn't they have a plan that said We're concerned about not getting enough whites in the schools. They go to private school once a tipping point is reached. I'm thinking of a New York public housing case where this was exactly what the authority decided. So what we're going to do is discriminate against minorities for all school assignments in order to spread them around and avoid a tipping point being reached. That would mean that minority children could not get into the schools of their choice or any schools in their neighborhoods beyond the point where the school board thought a tipping point would be reached. Could the schools discriminate against minority students in this way in order to achieve this race-conscious objective? I think I want to know more about the facts. In your hypothetical, it sounds as though minority students would be restricted to certain schools. Let's make it real simple. You've got a, what is it, about a 70-30? I think the city is around 50-50, but the schools are around 70-30 minority now, is that right? The schools are, the school-age children in Seattle are about 70, are about 70-30 white. The population of Seattle is about 70-30 white. The population of the school board is 60 percent minority, of the school district students is 60 percent minority approximately. 60-40? Yes. Okay. So what the schools could do in order to avoid tipping points is decree that no school should be more than 60 percent minority. And if you have a whole lot of minority children whose parents are trying to get them into Franklin, tough. They're the wrong color. Whites get ahead of them. And they have to get bussed across town where they don't have time to do their homework. Is that permissible because it's voluntary? Seattle used to do that. That was the plan that was at issue in the Washington v. Seattle litigation. While the plan itself was not directly challenged by the government in that case or the State, the Supreme Court, and indeed this Court seemed to think that in those times and in those circumstances, the board had authority to do it. But that's not what we do today. But you think the board could do that? There isn't a record today that attempts to justify those kinds of measures. What I'm trying to find out is what is the limit on race-conscious individual assignments that the school board believes are beneficent? See, when I think of a race-conscious school board, frankly, I think of the one in Virginia when I was growing up in the 50s. It was race-conscious, and I'm sure that the people on it had a high opinion of themselves and imagined that they were acting from purely benevolent motives and imposing segregation on the races. I don't think it was the right thing to do. I thought it was a terrible social evil. But they thought they were benevolent. And I'm thinking the kind of race-conscious assignment and deference to the school board that you suggest the equal protection clause requires us to honor would not draw any lines short of what that Virginia school board in the 50s was doing. I think not. I certainly don't go so far. What's the line? How do you draw the line? What's the principle? Well, there are clearly lines where, as Justice O'Connor said in Grutter, the line is drawn simply on the basis of some notion of racial inferiority or pure racial politics. And saying that children of color can't go to a certain school because of their color, or that white children can't go to a certain school. That's what you're saying in the Seattle plan. Well, when you get around the margins, why are you doing it? Are you doing it because of these notions of racial inferiority or because of racial inferiority? I think that unduly diminishes the Court's role. See, I'm suggesting to you, let's hypothesize the great majority of people who are on school boards have a very high opinion of their own virtue. So none of them would say they're acting from an evil intent. They would all say they're acting for the best interests of the children. Yes, and the Court has, as we know, the final say on that. But that doesn't mean that the Court ignores the social science. It doesn't mean that the Court ignores the judgment of the educators. And it doesn't mean that the Court hypothesizes alternatives, policies that have never been tested or even examined in a trial court and says, well, your plan's invalid because we sitting here in San Francisco think that a lottery will win. Yes, ma'am. The decision to adopt this plan, of course, is one of a long series of decisions that the school district has made over the years in running the public schools. And maybe you have an answer to the question that Mr. Correll couldn't answer. Why is it that three of the most desirable schools in Seattle are situated in San Francisco? They're situated in white neighborhoods when the population of Seattle, you tell us, is predominantly non-white. The students within the district are 60% non-white. And the population as a whole is 70%. So you have a city that has a minority of whites, and yet three of them, no, I'm sorry. The majority of the population, the vast majority of the population in Seattle is white. The students within the public schools are 60% of color. So some of these kids are going to private schools, is what you're saying? Absolutely. Seattle also, though, one of its demographics is that I think, like San Francisco, has relatively low birth rates. Counsel, I have a question. I was taking notes. The three popular north end schools, if left alone, you say would be 65 to 70% white. Right. Now, we know that up to now, the Supreme Court has allowed race based decisions in schools where there has been prior to jury segregation and in Grutter, and not in Graff's, where diversity is the compelling governmental interest. In Grutter, if I remember correctly, the law school class, the critical mass that was necessary for a robust educational system. And the other benefits, which diversity was claimed to have, was 20%. Why isn't that enough for K through 12? Is there a different basis? Is there a greater amount of critical mass needed for diversity in K through 12 than in Michigan law school? I think that comes back to the fundamental point that the interests that we are advancing here are different than the interests in viewpoint diversity that were at issue in Grutter. Because in Grutter, they were asking, the compelling governmental interest was a diverse student body, and your interest is a diverse racial student body. It's completely different, isn't it? It is completely different, and it also, while complementary, it has some different purposes. And this goes back to Judge Kuczynski's question. If you have new schools that, based on a neighborhood preference or a lottery, would be mostly accessible to white students in a district that's 60% minority, students of color, I think you have a problem of legitimacy. Which was one of the things that our board tried to deal with. And to try to segue back to Judge Kuczynski's question, one of the things that's interesting about the two North End schools that became oversubscribed and prompted this lawsuit, Ballard and Nathan Hale, is while they have always been located in predominantly white neighborhoods, until the late 1990s, they were predominantly minority schools. But then Ballard got a new building, a state-of-the-art building, and an activist principal. Nathan Hale got an activist principal. He gave a declaration that's in the record that's well worth a read, Eric Benson. And he turned that school around by implementing innovative programs, and all of a sudden, the neighborhood people wanted to go to that school, whereas before they might have wanted to go to Garfield. And so one of the things that the board, as it's trailing off of these more aggressive measures, wanted to be wary of is this situation where all of a sudden, students of color who could formally go to these schools were isolated, particularly in the two South End schools, Rainier Beach and Cleveland, that had 80 to 90% students of color. We had busing in Seattle, though, during the immediately preceding period of time, which, as I understand it, was terminated both because of community opposition to it, but as much for financial reasons based on the impact on the school district's budget, wasn't that true? The busing plan, the Seattle plan that was litigated in Seattle v. Washington, lasted about 10 years. And that had massive north-south busing. And the impacts of that were felt predominantly in the minority community. A lot of white parents took their children out of the schools rather than participate in that. The next iteration that went on for about another 10 years was the so-called control choice plan, which was these regional pairings where you would pair north-end and south-end neighborhoods and their schools. And so, for instance, the Magnolia neighborhood, where many of the PICS parents come from, their two schools were Ingram in the north and Franklin in the Rainier Valley. And so that plan had its own set of problems, primarily very limited choice. And so when the board moved away from that, it moved to this open choice plan. But recognizing that if it did so and allowed choice in neighborhood to be the only factors, that it was going to be an open choice plan. And so we're going to run into this issue that we've just discussed, where newly popular schools would be essentially cut off from three-quarters of the minority population. Of course, the school district does permit that in K-8, does it not? Those are all neighborhood schools in which you can attend. There's some risk in me talking about K-8, partly because I don't know and partly because it's outside the record. Let's stick with the latter. But it is the case that the tiebreakers operate and that they're within those levels as well. But basically, you do not have citywide choice in K-8 the way you do in high school. Judge Fletcher speaking. One of the alternatives that's been put on the table here is a strict lottery. Do we have something in the record that tells us what happens to busing and travel times if we had a strict lottery where all students were assigned, irrespective of residence, irrespective of race, but simply based on a lottery? No, Your Honor. To my knowledge, we do not, because the board was committed to balancing choice in neighborhood and did not ever look at a lottery. I see. Counsel, I was curious about your response to Judge Kleinfeld's question regarding the school districts in Virginia in the 50s. Do you see this situation as comparable, for in Virginia, the brunt of the burden of segregation was on the backs of nonwhite students? It's not comparable to my knowledge in terms of the causative factors, meaning school boards that consciously sat there and said, we are going to maintain racial separation. However, certainly the busing plan that was in place from the late 70s to the late 80s, one of its effects was that it did burden minority students more than it burdened white students for two reasons, because there were racial lids on enrollment in certain schools, predominantly the south end schools. And so even if there were seats at those schools, students from those neighborhoods would have to get on a bus and go north. Were those plans embodied with a racial inferiority component? I don't think so. I think those plans came about because the Seattle School District, quite frankly, was threatened with litigation after the Keys case, and the board, which had had voluntary measures in place at that time, recognized that it needed to go to mandatory measures. And so your time has expired. Thank you, Your Honor. I see I have about three minutes left, and I'd like to make just a few points. Mr. Madden talked about the record and the fact that we're here on appeal from summary judgment. The parents in this case have established that the school district uses race to decide who gets to attend which of the popular high schools. The school district bears the burden of proving that its plan is narrowly tailored to serve a compelling interest, and it has failed to do so. If there are holes in the record with respect to narrow tailoring, it's because the school district has not come forward with admissible evidence to show that its plan is narrowly tailored. A key aspect of the narrow tailoring inquiry. You can always find narrower tailoring. I'm assuming we are in narrow tailoring category. All you've said is you think it could be done better. I'm not sure that that defeats narrow tailoring. There are a number of components to the narrow tailoring. They've got a pretty good explanation. They've come up with a plan that adopts a reasonable advance, reasonable limits. Why is that narrow enough? If the test for reasonableness, Your Honor, I think Your Honor is correct. No, I said there were reasonable bands. And given that the bands that they selected fall within 15 percent of the actual population, and these are all reasonable numbers, why isn't that narrow tailoring enough? I mean, the fact that you can come up with something that's more narrowly tailored, why is that a good argument? Because the law requires that they use the narrowest means available. But your position seems to be there's nothing they can do because they can't take race into account, period. So your narrow tailoring means doing everything possible that doesn't involve race at all. So you prefer the lottery? That's right. And what else? Any number of things, Your Honor. I think they could have used a lottery. The suggestion that a lottery would have some disparate effect or not be available to everyone doesn't make any sense. So you don't think sibling would make any difference? I think sibling is a fine tiebreaker. We haven't proposed lottery as a tiebreaker. Well, it can't be a tiebreaker because your idea is basically to do lottery and then see how things fall out. That's incorrect, Your Honor. My suggestion is, and we're not lobbying for a lottery, my suggestion is that lottery could be a tiebreaker in place of race in the current plan. There's no question that lottery is going to be distributed evenly. And 82 percent of the students are asking to attend these schools. There's no reason to think there's going to be a self-selection problem. Lottery would yield a racial balance the same as the racial balance of the students who are interested in attending those schools. Is there evidence to that effect here? Did you put in evidence to that effect, that a lottery would be better and more important? I think it's plain from the facts that are in the record, Your Honor. 82 percent of the students want to attend these five oversubscribed schools. If they were all assigned a random lottery number, the lottery number would be the ratio breakdown of the students who were assigned the lottery numbers. Well, you'd apply the lottery only to the people that were disputed. You have to then run those numbers in comparison to what the makeup of the school itself is concerned. It's not clear at all to me that that means that the final makeup will be random. You're not saying you're going to take everybody in the school system and run a lottery and they wind up at the school where they draw the number. That would surely be random, but then you'd have people traveling from north to south and south to north and east to west all over the place with no regard for neighborhood. What you're saying is we're going to accept to some extent personal choice and then we're going to run a lottery on top of what's there now. That doesn't strike me as always being self-evident. Why is that self-evident? What you get at that end then becomes racially reflect of the community. The overwhelming majority of students are asking to attend these schools, so a lottery number is going to be assigned to the overwhelming majority of those students. And if it is indeed random, it would reflect that racial breakdown. The more important point is the school district had an obligation to consider those kinds of alternatives and evaluate them, and they did not. They failed to carry their burden and the court should reverse the decision. Thank you, counsel. The matter just argued is submitted for decision and the court stands adjourned. All rise.
judges: Schroeder, Kozinski, Rymer, Thomas, W Fletcher, Paez, Berzon, Tallman, Clifton, Bybee, Callahan